George Haines
Nevada Bar No. 9411
Gerardo Avalos
Nevada Bar No. 15171
**FREEDOM LAW FIRM**
8985 S. Eastern Avenue Suite 100
Las Vegas, NV 89123
Telephone: 702-880-5554
Facsimile: 702-385-5518
Email: info@freedomlegalteam.com
*Counsel for Plaintiff and the Proposed Class*
(*additional counsel appear on signature page*)

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| KATHLEEN JORDAN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>     v.<br><br>ABSOLUTE DENTAL GROUP, LLC,<br><br>                    Defendant. | Case No. 2:25-cv-00986<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

Plaintiff Kathleen Jordan ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Absolute Dental Group, LLC ("ADG" or "Defendant") based upon personal knowledge with respect to Plaintiff and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Plaintiff brings this class action against ADG for its failure to properly secure and safeguard Plaintiff's and other similarly situated ADG patients' personally identifiable information ("PII") and protected health information ("PHI"), from criminal hackers, including at least some of the following information, among other sensitive information: names, dates of birth, health information, dental information and records, doctor's name, health and/or dental insurance information, medical billing or claims information, prescription or medication information, Social Security numbers, and treatment information ("Private Information").

2.    ADG is a Nevada-based dental care provider that serves many thousands of patients.

3.    On or about May 2, 2025, ADG filed a notice with the United States Department of Health and Human Services Office for Civil Rights (HHS OCR), disclosing a data breach impacting ADG's network servers (the "Data Breach").[1]

4.    Little detail is available concerning the Data Breach and ADG has failed to disclose critical information about its investigation, post-breach containment, and remediation efforts that would enable breach victims to take necessary steps to protect themselves against the harms caused by the Data Breach.

---

[1] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Department of Health and Human Services Office for Civil Rights https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 2, 2025)

5.      Because of ADG's conduct and data privacy failures, Plaintiff and Class Members are and continue to be at a significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

6.      The Private Information compromised in the Data Breach includes highly sensitive data, which is a gold mine for data thieves. Armed with sensitive Private Information, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

7.      Despite reporting the Data Breach to HHS OCR, ADG has provided no assurance that all personal data or copies of data have been recovered or destroyed, or that it has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

8.      Therefore, Plaintiff and Class Members have suffered and remain at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9.      Plaintiff brings this class action lawsuit to address ADG's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

10.      The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to ADG, and thus ADG was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

11.      Upon information and belief, ADG failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information.

12. Plaintiff's and Class Members' identities are now at risk because of ADG's conduct, as the Private Information that ADG collected and maintained is now in the hands of data thieves and other unauthorized third parties.

13. Plaintiff seeks to remedy these harms on behalf of Plaintiff and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

14. Accordingly, Plaintiff, individually and on behalf of the Class, asserts claims for negligence, negligence per se, breach of express and implied contract, unjust enrichment, breach of fiduciary, breach of confidence, and declaratory and injunctive relief.

## II.    PARTIES

**Plaintiff**

***Plaintiff Kathleen Jordan***

15. Plaintiff Kathleen Jordan is, and at all times mentioned herein was, an individual citizen of the State of Nevada.

16. Plaintiff is a patient of ADG and has been a patient of ADG since 2008. Plaintiff routinely has provided Private Information to ADG in connection with receiving ADG's services. In requesting, requiring and maintaining Plaintiff's Private Information for its business purposes, ADG impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's Private Information. ADG did not take proper care of Plaintiff's Private Information, leading to its theft as a direct result of ADG's inadequate security measures and data protection protocols.

17. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain heightened measures for years, and possibly for life.

18. On information and belief, following the Data Breach, Plaintiff was a victim of identity theft, in which an unauthorized individual opened a PayPal account in Plaintiff's name, and incurred charges or debt associated with that account.

19. Plaintiff also suffered actual injury from having Private Information compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential Private Information—a form of property that Plaintiff entrusted to

ADG, which was compromised as a result of the Data Breach and (b) a violation of Plaintiff's privacy rights as a result of unauthorized disclosure of Private Information.

20.     Had Plaintiff known that ADG does not adequately protect Private Information, Plaintiff would not have used ADG's services nor agreed to provide ADG with Private Information.

21.     As a result of ADG's failure to adequately safeguard Plaintiff's Private Information, Plaintiff has been injured. Plaintiff also is at a continued risk of harm because Plaintiff's Private Information remains in ADG's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the Private Information in its possession.

**Defendant**

### *Absolute Dental Group, LLC*

22.     Defendant ADG is a dental services practice and provider and a Delaware corporation with its principal place of business located at 8370 W. Cheyenne Ave Ste. 103, Las Vegas, NV 89129.

### III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and, upon information and belief, members of the proposed Class are citizens of states different from Defendant.

24.     This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, and because Defendant resides in this judicial district.

CLASS ACTION COMPLAINT

## IV.     FACTUAL ALLEGATIONS

### A.     ADG's Business and Collection of Plaintiff's and Class Members' Private Information

26.     ADG is a Nevada based dental service organization with over fifty locations.[2] ADG provides comprehensive dental services ranging from general dental and hygienist services to orthodontics, oral surgery, pedodontics, and endodontics.[3] ADG generates approximately $44 million in annual revenue.

27.     As a condition of receiving services, ADG requires that its patients entrust it with highly sensitive personal and health information. In the ordinary course of receiving service from ADG, Plaintiff and Class Members were required to provide their Private Information to Defendant.

28.     In its Privacy Policy, ADG states that "[y]our information, whether public or private, will not be sold, exchanged, transferred, or given to any other company for any reason whatsoever, without your consent, other than for the express purpose of delivering the purchased product or service requested."[4]

29.     Due to the highly sensitive and personal nature of the information ADG acquires and stores with respect to its patients, ADG, upon information and belief, promises to, among other things: keep patients' Private Information private; comply with industry standards related to data security and the maintenance of its patients' Private Information; inform its patients of its legal duties relating to data security and comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services it provides; and provide adequate notice to patients if their Private Information is disclosed without authorization.

---

[2] *Connect With a Trusted General Dentist in* Nevada, Absolute Dental, https://www.absolutedental.com/about/general-dentists/ (last visited June 2, 2025).
[3] *About*, Absolute Dental, https://www.absolutedental.com/about/ (last visited June 2, 2025).
[4] *Privacy Policy*, Absolute Dental, https://www.absolutedental.com/privacy-policy/ (last visited June 2, 2025).

30.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, ADG assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

31.    Plaintiff and Class Members relied on ADG to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B.    The Data Breach**

32.    Little information is available concerning the Data Breach, and ADG has provided scant details about it outside of the filing it made with HHS OCR on May 2, 2025.

33.    According to the HHS OCR notice, the Data Breach involved a hacking/IT Incident on ADG's network server.[5]

34.    Per ADG's report on the HHS OCR website, ADG identifies that 501 individuals have been impacted by the Data Breach. On information and belief, this number is substantially higher, and the 501 individuals figure is simply a placeholder figure. Indeed, the HHS OCR data breach reporting portal makes clear that "[a]s required by section 13402(e)(4) of the HITECH Act, the Secretary must post a list of breaches of unsecured protected health information affecting 500 or more individuals."[6]

35.    On information and belief, the information disclosed during the Data Breach includes some or all of the following information, and potentially other sensitive information: names, dates of birth, health information, dental information and records, doctor's name, health and/or dental insurance information, medical billing or claims information, prescription or medication information, Social Security numbers, and treatment information.

36.    To date, Defendant has failed to disclose crucial details like the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a

---

[5] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, *supra*.
[6] *Id.*

breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

37. Thus, ADG's purported disclosure to HHS OCR amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

38. In addition, ADG offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves.

39. ADG had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

40. Plaintiff and Class Members provided their Private Information to ADG with the reasonable expectation and mutual understanding that ADG would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

41. ADG's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

42. ADG knew or should have known that its electronic records would be targeted by cybercriminals.

**C.    Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of Private Information are Particularly Susceptible to Cyberattacks**

43. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant.

44. Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected Private Information

is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

45.    In 2021, a record 3,205 data breaches occurred, resulting in approximately 353,027,892 individuals being compromised, a 78% increase from 2022.[7]

46.    In light of recent high profile data breaches at other healthcare providers, Defendant knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

47.    As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

48.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

49.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially tens or hundreds of thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

50.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

51.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[7] *ITRC 2023 Data Breach Report – Key Findings and Solutions*, Bluefin, https://www.bluefin.com/bluefin-news/itrc-2023-data-breach-report-key-findings-and-solutions/ (last visited Apr. 17, 2025).

### D.    Value of Personally Identifiable Information

52.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[8] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[9]

53.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[10]

54.    For example, Private Information can be sold at a price ranging from $40 to $200.[11] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

55.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[13]

56.    The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (e.g., patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to

---

[8] 17 C.F.R. § 248.201 (2013).

[9] *Id.*

[10] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[12] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 2, 2025).

[13] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187 (last visited June 2, 2025).

cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the health care industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

57.    Between 2005 and 2019, at least 249 million people were affected by health care data breaches.[14] Indeed, during 2019 alone, over 41 million health care records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[15] In short, these sorts of data breaches are increasingly common, especially among health care systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[16]

58.    According to account monitoring company LogDog, medical data sells for $50 and up on the dark web.[17]

59.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[18]

60.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-

---

[14] Adil Hussain She Et Al., *Healthcare Data Breaches: Insights and Implications* (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.

[15] Steve Alder, *December 2019 Healthcare Data Breach Report*, The HIPAA Journal (Jan. 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.

[16] Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breaches*, Tenable (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

[17] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

[18] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

CLASS ACTION COMPLAINT

pocket costs for health care they did not receive to restore coverage.[19] Almost half of medical identity theft victims lose their health care coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[20]

61.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—PHI and names—is impossible to "close" and difficult, if not impossible, to change.

62.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[21]

63.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

64.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[19] *See* Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.
[20] *Id.*
[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

**E.    Defendant Failed to Comply with FTC Guidelines**

65.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

66.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

67.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

68.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[22] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

70.     Defendant was at all times fully aware of its obligation to protect the Private Information of consumers under the FTCA, yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**F.    Defendant Failed to Comply with HIPAA**

71.     On information and belief, Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

72.     On information and belief, Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").  *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

73.     HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

74.     HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

75.    HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

76.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

77.    HIPAA's Security Rule requires Defendant to do the following:

  a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

  b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

  c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

  d.  Ensure compliance by its workforce.

78.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

79.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

CLASS ACTION COMPLAINT

80.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

81.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

82.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

83.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

84.    Defendant was at all times fully aware of its HIPAA obligations to protect the Private Information of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**G.    Defendant Failed to Comply with Industry Standards**

85.    Experts studying cybersecurity routinely identify health care providers like Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

86.    Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

87.    Other best cybersecurity practices that are standard within healthcare networks that store Private Information include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

88.    Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

89.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H.    Defendant Breached Its Duty to Safeguard Plaintiff's and Class Members' Private Information**

90.    In addition to its obligations under federal laws, Defendant owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

91.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.    Failing to adequately protect consumers' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to adhere to industry standards for cybersecurity as discussed above; and

e.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

92.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems, which contained unsecured and unencrypted Private Information.

93.    Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

**I.      Plaintiff and Class Members Suffered Common Injuries and Damages**

94.      As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

*Increased and Imminent Risk of Identity Theft*

95.      Plaintiff and Class Members are at a heightened risk of identity theft for years to come as a result of the Data Breach.

96.      The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of cybercriminals that commit attacks of this type. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

97.      The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

98.      Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

99.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

100.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[23]

101.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

102.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not

---

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

### *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

103.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

104.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

105.    These efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches ("GAO Report"), in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

106.    These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

---

[24] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* United States Government Accountability Office, GAO-07-737, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

1  contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on

2  their credit, and correcting their credit reports.[25]

3                              *Diminished Value of Private Information*

4        107.    PII and PHI are valuable property rights.[26] Their value is axiomatic, considering

5  the value of Big Data in corporate America and the consequences of cyber thefts include heavy

6  prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private

7  Information has considerable market value.

8        108.    An active and robust legitimate marketplace for Private Information exists. In 2019,

9  the data brokering industry was worth roughly $200 billion.[27]

10       109.    In fact, the data marketplace is so sophisticated that consumers can actually sell

11  their non-public information directly to a data broker who in turn aggregates the information and

12  provides it to marketers or app developers.[28]

13       110.    Consumers who agree to provide their web browsing history to the Nielsen

14  Corporation can receive up to $50.00 a year.[29]

15       111.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information,

16  which has an inherent market value in both legitimate and dark markets, has been damaged and

17  diminished by its compromise and unauthorized release. However, this transfer of value occurred

18  without any consideration paid to Plaintiff or Class Members for their property, resulting in an

19  economic loss. Moreover, the Private Information is now readily available, and the rarity of the

20  Data has been lost, thereby causing additional loss of value.

21  ───────────────

    [25] *See Identity Theft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last
22  visited June 3, 2025).
    [26] *See, e.g.*, John T. Soma Et Al*., Corporate Privacy Trend: The "Value" of Personally
23  Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH.
    11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is
24  rapidly reaching a level comparable to the value of traditional financial assets.") (citations
    omitted).
25  [27] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak,* Los Angeles
    Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
26  [28] *Main Page*, https://datacoup.com/ (last visited June 3, 2025).
    [29] *Frequently Asked Questions*, Nielsen Computer & Mobile Panel,
27  https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited June 3, 2025).

28

112.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

113.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network, which upon information and belief, amounts to tens or hundreds of thousands of individuals' Private Information, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

114.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**J.  The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.**

115.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

116.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

117.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

1

## V.    CLASS ACTION ALLEGATIONS

2    118.    Plaintiff brings this action individually, and on behalf of all members of the

3    following Classes (together, the "Class" or "Classes") of similarly situated persons:

4
**Nationwide Class**

5    All persons residing in the United States whose Private Information
was compromised in the Data Breach disclosed by Absolute Dental

6    Group, LLC, including all who were sent notice of the Data Breach.

7    **Nevada Class**

8    All persons residing in the state of Nevada whose Private Information was
compromised in the Data Breach disclosed by Absolute Dental Group, LLC,

9    including all who were sent notice of the Data Breach.

10    119.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities

11    in which it has a controlling interest, as well as its officers, directors, affiliates, legal

12    representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom

13    this case is assigned as well as their judicial staff and immediate family members.

14    120.    Plaintiff reserves the right to modify or amend the definitions of the proposed

15    Classes, before the Court determines whether certification is appropriate.

16    121.    Certification of Plaintiff's claims for class-wide treatment is appropriate because

17    Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as

18    would be used to prove those elements in individual actions alleging the same claims.

19    122.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is

20    impracticable. Though the exact number and identities of Class Members are unknown at this time,

21    based on information and belief, the Class consists of tens or hundreds of thousands of patients of

22    ADG who are geographically dispersed, including in states beyond Nevada, whose data was

23    compromised in the Data Breach. The identities of Class Members are ascertainable through

24    ADG's records, Class Members' records, publication notice, self-identification, and other means.

25    123.    <u>Commonality</u>. There are questions of law and fact common to the Class which

26    predominate over any questions affecting only individual Class Members. These common

27    questions of law and fact include, without limitation:

28    a.    Whether ADG engaged in the conduct alleged herein;

b.   Whether ADG's conduct violated the FTCA and HIPAA;

c.   When ADG learned of the Data Breach

d.   Whether ADG's response to the Data Breach was adequate;

e.   Whether ADG unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.   Whether ADG failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.   Whether ADG's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   Whether ADG's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether ADG owed a duty to Class Members to safeguard their Private Information;

j.   Whether ADG breached its duty to Class Members to safeguard their Private Information;

k.   Whether hackers obtained Class Members' Private Information via the Data Breach;

l.   Whether ADG had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.   Whether ADG breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.   Whether ADG knew or should have known that its data security systems and monitoring processes were deficient;

o.   What damages Plaintiff and Class Members suffered as a result of ADG's misconduct;

p.   Whether ADG's conduct was negligent;

q.   Whether ADG's conduct was per se negligent;

24

CLASS ACTION COMPLAINT

r. Whether ADG's conduct constitutes a breach of contract;

s. Whether ADG's conduct constitutes a breach of implied contract;

t. Whether ADG was unjustly enriched;

u. Whether ADG's conduct constitutes a breach of fiduciary duty;

v. Whether ADG's conduct constitutes a breach of confidence;

w. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

x. Whether Plaintiff and Class Members are entitled to credit or identity monitoring and monetary relief; and

y. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

124. ADG engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

125. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of ADG. Plaintiff is advancing the same claims and legal theories on behalf of Plaintiff and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

126. <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

127. <u>Predominance</u>. ADG has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same

computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from ADG's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for ADG. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). ADG has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

130. Finally, all members of the proposed Class are readily ascertainable. ADG has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by ADG.

## **CLAIMS FOR RELIEF**

## **COUNT I**

### **NEGLIGENCE**

131. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

132.    ADG knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information. ADG had a duty to exercise reasonable care in safeguarding, securing, and protecting the Private Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

133.    ADG's duty also included the responsibility to implement processes by which it could quickly detect and analyze a breach of its security systems, and give prompt notice to those affected in the event of a cyberattack.

134.    ADG knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. ADG was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

135.    ADG owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. ADG's duties included, but were not limited to, the following:

      a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.   To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

      c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

      d.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

      e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

      f.   To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

136.    ADG's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

137.    ADG's duty also arose because Defendant was bound by industry standards to protect its patients' confidential Private Information.

138.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and ADG owed them a duty of care to not subject them to an unreasonable risk of harm.

139.    ADG, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within ADG's possession.

140.    ADG, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

141.    ADG, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

142.    ADG breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b.    Failing to adequately monitor the security of its networks and systems;

   c.    Failing to periodically ensure that its email system maintained reasonable data security safeguards;

   d.    Allowing unauthorized access to Class Members' Private Information;

   e.    Failing to comply with the FTCA; and

   f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

143.    ADG acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

144.    ADG had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust ADG with their Private Information was predicated on the understanding that ADG would take adequate security precautions. Moreover, only ADG had the ability to protect its systems (and the Private Information that it stored on them) from attack.

145.    ADG's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

146.    As a result of ADG's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

147.    ADG's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

148.    As a result of ADG's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

149.    ADG also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

150.    As a direct and proximate result of ADG's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

151.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

152.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

153.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring ADG to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

<u>**COUNT II**</u>

**NEGLIGENCE PER SE**

154.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

155.    Pursuant to Section 5 of the FTCA, ADG had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

156.    Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., ADG had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

157.    Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

158.    ADG breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

159.    Specifically, ADG breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

160.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of ADG's duty in this regard.

161.    ADG also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

162.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to ADG's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

163.    Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect, and ADG's failure to comply with both constitutes negligence per se.

164.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to ADG's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

165.    As a direct and proximate result of ADG's negligence per se, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse of their Private Information and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

166.    As a direct and proximate result of ADG's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

CLASS ACTION COMPLAINT

167.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring ADG to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT III

## BREACH OF CONTRACT

168.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

169.    Plaintiff and Class Members entered into a valid and enforceable contract through which they paid money to ADG in exchange for services. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiff's and Class Members' Private Information.

170.    ADG's Privacy Policy memorialized the rights and obligations of ADG and its patients. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

171.    In the Privacy Policy, ADG commits to protecting the privacy and security of private information and promises to never share Plaintiff's and Class Members' Private Information except under certain limited circumstances.

172.    Plaintiff and Class Members fully performed their obligations under their contracts with ADG.

173.    However, ADG did not secure, safeguard, and/or keep private Plaintiff's and Class Members' Private Information, and therefore ADG breached its contracts with Plaintiff and Class Members.

174.    ADG allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' Private Information without permission. Therefore, ADG breached the Privacy Policy with Plaintiff and Class Members.

175.    ADG's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA, HIPAA, and applicable industry standards, resulted in ADG providing services to Plaintiff and Class Members that were of a diminished value.

176.    As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendant's failure to fully perform its part of the bargain with Plaintiff and Class Members.

177.    As a direct and proximate result of ADG's conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

178.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring ADG to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT IV

### BREACH OF IMPLIED CONTRACT

179.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

180.    This Count is pleaded in the alternative to Count III above.

181.    ADG provides dental and related services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

182.    Through Defendant's sale of services to Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

183.    As consideration, Plaintiff and Class Members paid money to ADG and/or turned over valuable Private Information to ADG. Accordingly, Plaintiff and Class Members bargained with ADG to securely maintain and store their Private Information.

184.    ADG accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

185.    In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiff and Class Members intended and understood that ADG would adequately safeguard the Private Information as part of those services.

186.    Defendant's implied promises to Plaintiff and Class Members include, but are not limited to: (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiff's and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

187.    Plaintiff and Class Members would not have entrusted their Private Information to ADG in the absence of such an implied contract.

188.    Had ADG disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to ADG.

189.    As a provider of dental health services, ADG recognized (or should have recognized) that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

190.    ADG violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information. ADG further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

191.    Additionally, ADG breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

192.    ADG also breached the implied contracts with Plaintiff and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

193.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

194.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

195.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2).

196.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

197.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 CFR 164.306(a)(94).

198.    ADG further breached the implied contracts with Plaintiff and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

199.    ADG further breached the implied contracts with Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 CFR 164.530(c).

200.    ADG further breached the implied contracts with Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PHI.

201.    A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to ADG in exchange for ADG's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

202.    Plaintiff and Class Members have been damaged by ADG's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## <u>COUNT V</u>

### UNJUST ENRICHMENT

203.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

204.    This Count is pleaded in the alternative to Counts III and IV above.

205.    Plaintiff and Class Members conferred a benefit on ADG by turning over their Private Information to Defendant and by paying for services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

206.    Upon information and belief, ADG funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

207.    As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to ADG.

208.    ADG has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

209.    ADG knew that Plaintiff and Class Members conferred a benefit upon it, which ADG accepted. ADG profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

210.    If Plaintiff and Class Members had known that ADG had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

211.    Due to ADG's conduct alleged herein, it would be unjust and inequitable under the circumstances for ADG to be permitted to retain the benefit of its wrongful conduct.

212.    As a direct and proximate result of ADG's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in ADG's possession and is subject to further unauthorized disclosures so long as ADG fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

213.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from ADG and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by ADG from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

214.    Plaintiff and Class Members may not have an adequate remedy at law against ADG, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VI

## BREACH OF FIDUCIARY DUTY

215.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

216.    In light of the special relationship between ADG and its patients, whereby ADG became a guardian of Plaintiff's and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) ADG was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members. This benefit included (1) the safeguarding of Plaintiff's and Class Members' Private Information; (2) timely notifying Plaintiff and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where ADG's patients' Private Information was and is stored.

217.    ADG had a fiduciary duty to act for the benefit of Plaintiff and the Class upon matters within the scope of its patients' relationship, in particular to keep the Private Information secure.

218.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to diligently investigate the Data Breach to determine the number of Class Members affected and notify them within a reasonable and practicable period of time.

219.    ADG breached its fiduciary duties to Plaintiff and the Class by failing to protect their Private Information.

220.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI ADG created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

221.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

222.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

223.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

224.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR 164.306(a)(2).

225.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

226.    ADG breached its fiduciary duties to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 CFR 164.306(a)(94).

227.    ADG breached its fiduciary duties to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

228.    As a direct and proximate result of ADG's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**COUNT VII**

**BREACH OF CONFIDENCE**

229.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

230.    Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by ADG and ultimately accessed and acquired in the Data Breach.

231.    As a healthcare provider, ADG has a special, fiduciary relationship with its patients, including Plaintiff and Class Members. Because of that special relationship, ADG was provided with and stored Plaintiff's and Class Members' Private Information and had a duty to maintain the Private Information in confidence.

232.    Patients like Plaintiff and Class Members have a privacy interest in personal medical and other matters, and ADG had a duty not to disclose such matters concerning its patients.

233.    As a result of the parties' relationship, ADG had possession and knowledge of highly sensitive and confidential Private Information belonging to Plaintiff and Class Members, information that was not generally known.

234.    Plaintiff and Class Members did not consent nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

235.    ADG breached its duty of confidence owed to Plaintiff and Class Members by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of Plaintiff's and Class Members' Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement adequate information safeguards

to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff's and Class members' Private Information to a criminal third party.

236.    But for ADG's wrongful breach of its duty of confidence owed to Plaintiff and Class Members, their Private Information would not have been compromised.

237.    As a direct and proximate result of ADG's wrongful breach of its duty of confidence, Plaintiff and Class Members have suffered and will continue to suffer the injuries alleged herein.

238.    It would be inequitable for ADG to retain the benefit of controlling and maintaining Plaintiff's and Class Members' Private Information at the expense of Plaintiff and Class Members.

239.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT VIII

## DECLARATORY AND INJUNCTIVE RELIEF, 28 U.S.C. § 2201

240.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

241.    Defendant owes a duty of care to Plaintiff and Class Members that required them to adequately secure their Private Information.

242.    Defendant still possess Plaintiff's and Class Members' Private Information, yet does not adequately protect PII against the threat of another data breach.

243.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and Class Members.

244.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's obligations and duties of care to provide security measures to Plaintiff and Class Members.

Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's ongoing failure to address the security failings that led to such exposure.

245.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the Data Breach.

246.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with its obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, being ordered as follows:

    a.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    b.   ordering that Defendant engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    c.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    d.   ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    e.   ordering that Defendant audit, test, and train security personnel and employees regarding any new or modified data security policies and procedures;

    f.   ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for provision of services;

    g.   ordering that Defendant conduct regular database scanning and security checks;

    h.   prohibiting Defendant from maintaining Private Information of Plaintiff and Class Members on a cloud-based database;

i.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

j.   ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive Private Information;

k.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

l.   requiring Defendant to meaningfully educate all class members about the threats they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

m.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

n.   such other and further relief as this Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class described above, seeks the following relief:

a.   Certifying the class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

43

b.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing ADG to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.  An order requiring ADG to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

247.  Pursuant to Federal Rule of Civil Procedure 38 and the seventh amendment to the Constitution of the United States of America and the Constitution of the State of Nevada, Plaintiff is entitled to, and demands a trial by jury.

DATED: June 4, 2025.

Respectfully submitted,

/s/ *Gerardo Avalos*
George Haines, Esq.
Gerardo Avalos, Esq.
**FREEDOM LAW FIRM**
8985 S. Eastern Avenue, Suite 100
Las Vegas, NV 89123

Andrew W. Ferich, Esq. (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Alyssa Brown, Esq. (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
abrown@ahdootwolfson.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT